**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Durham Stabilization Incorporated, | No. CV-15-08166-PCT-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| SBBI Incorporated, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff United States of America, for the use and benefit of Durham Stabilization, Inc.'s Motion for Partial Summary Judgment on the First and Second Claims for Relief, ("Plaintiff's Motion," Doc. 23), and Defendants SBBI, Inc. and Hartford Fire Insurance Company's Motion for Summary Judgment, ("Defendants' Motion," Doc. 25). The Court now rules on both Motions.

**I. BACKGROUND[1]**

This case arises out of the Three Forks Road Project (the "Project") for the United States government located in Apache County, Arizona. Defendant SBBI was the prime

---

[1] Pursuant to the Court's Order dated December 20, 2016, (Doc. 35), Defendants withdrew, edited, and resubmitted a sworn declaration by Deborah Fain, president and shareholder of SBBI. (Doc. 37). The substituted declaration clarified whether Ms. Fain had personal knowledge of the information contained therein. Plaintiff subsequently filed an objection to the substituted declaration—particularly, paragraph 16—arguing that deposition testimony by Ms. Fain contradicted paragraphs within the substituted declaration. (Doc. 38). The Court declines to rule on Plaintiff's objection at this time (without prejudice to Plaintiff raising this objection at trial) because Defendants have cited to similar statements by other witnesses in the record. (*See* Docs. 30-1 at 31–33; 30-2 at 16–17). Plaintiff does not object to the personal knowledge of these witnesses.

contractor on the Project. SBBI subcontracted with Plaintiff Durham Stabilization.

In May 2014, SBBI entered into a construction contract with the Federal Highway Administration ("FHA") involving the Project. (Separate Statement of Facts in Support of Plaintiff['s] Motion for Partial Summary Judgment, Doc. 24 ("PSOF") at ¶¶ 1, 2; Defendants['] Statement of Facts, Doc. 26 ("DSOF") at ¶ 1). SBBI obtained a Miller Act payment bond from Defendant Hartford Fire Insurance Company in relation to the Project. (PSOF at ¶ 3; Defendants['] Controverting Statement of Facts, Doc. 29 at 3–17 ("DCSOF") at ¶ 3).

SBBI subcontracted with Plaintiff to provide materials in the estimated quantities as follows:

| Item Description | Est. Quantity (tons) | Unit Price | Total Amount |
|---|---|---|---|
| Emulsified Asphalt Grade CSS-1 | 1,310.00 | $700.00 | $917,000.00 |
| Emulsified Asphalt Treated Aggregate Base | 66,800.00 | $10.54 | $704,072.00 |
| | | **Total** | $1,621,072.00 |

(Doc. 1-1 at 11). Plaintiff also agreed to provide two types of bond allocation.[2] (*Id.*). The subcontract was a unit price contract, which obligated SBBI to pay Plaintiff for all items actually supplied by Plaintiff, even if those amounts were above the estimates provided in the subcontract. (DSOF at ¶ 4; Plaintiff['s] Objection to Defendant[']s Separate Statement of Facts, Doc. 28 ("PODSOF") at ¶ 4; Doc. 1-1 at 3).

SBBI grew concerned over "potential negative effects of rain on paving conditions" and wanted to change the materials it had contracted with FHA to provide. (Doc. 37 at 2; *see also* Doc. 24-2 at 18). As a result, after SBBI and Plaintiff entered into the subcontract but before Plaintiff commenced work, SBBI and Plaintiff agreed to a "no-

---

[2] The payments on the bond premium are not at issue in this litigation and, thus, will not be further referenced in this Order. (*See* PSOF at ¶ 30; DCSOF at ¶ 30).

- 2 -

1
2
3
4
5
6
7
8
9
10
11

cost change order" but failed to define this term during their negotiations.[3] (Docs. 24-1 at 17; 24-2 at 14; 23 at 3; 29 at 6). SBBI and Plaintiff agreed to replace the emulsified asphalt grade CSS-1 with two separate items: foamed asphalt grade oil ("FAGO") and cement type II/V. The two parties agreed to price the cement at $400 per ton, but it is unclear whether the parties agreed to a specific unit price for the FAGO. (PSOF at ¶ 7; DCSOF at ¶ 7). Maintaining a price of $10.54 per ton, SBBI and Plaintiff also agreed to replace the emulsified asphalt treated aggregate base with foamed asphalt and cement treated aggregate base. (PSOF at ¶ 7; DCSOF at ¶ 7). While the subcontract included a procedure for the parties to follow in implementing a written change order, (Doc. 1-1 at 4), the parties ignored this provision and agreed to the change order orally, (Docs. 24-1 at 17; 24-2 at 14; DSOF at ¶ 18; PODSOF at ¶ 18).

12
13
14
15
16
17
18
19
20

In June 2014, SBBI submitted to FHA an informal, written proposal to change the contract specifications, reflecting the change of materials described above. (DSOF at ¶ 9; PODSOF at ¶ 9; Doc. 24-2 at 98–99). In the proposal, SBBI stated that the change "would not affect the cost to [FHA]," and "SBBI will absorb the additional cost for this method of installation since the current specification will be very difficult to meet this time of year owing to anticipated monsoonal activity for the area." (Doc. 24-2 at 98). FHA did not return the "final Amendment of Solicitation/Modification of Contract," reflecting the aforementioned changes, to SBBI until December 2014. (DSOF at ¶ 31; PODSOF at ¶ 31).

21
22
23
24
25
26

In August 2014, FHA acknowledged that it would approve the changes pending receipt of "certified cost and pricing data" and notified SBBI that it could proceed with the proposed contract change. (Doc. 24-2 at 56–57, 167–68; PSOF at ¶ 13; DCSOF at ¶ 13). Shortly thereafter, SBBI communicated this approval to commence work to Plaintiff. (PSOF at ¶ 13; DCSOF at ¶ 13; Doc. 24-2 at 59). Plaintiff then completed the work pursuant to the changed specifications in a "timely and workmanlike manner."

27
28

---

[3] Despite SBBI and Plaintiff finalizing the change order after entering into the subcontract, the evidence suggests that the parties had planned to request the change order even before SBBI submitted the bid to FHA. (*See* Docs. 30-1 at 22; 24-1 at 46).

(PSOF at ¶ 15; DCSOF at ¶ 15; Doc. 24-3 at 3).

Plaintiff submitted two invoices to SBBI for the project: one based on estimated quantities and the second based on actual quantities delivered for the Project. (PSOF at ¶ 16; DCSOF at ¶ 16). Plaintiff's second invoice—based on actual quantities delivered—included the following quantities and unit prices:

| Item Description | Quantity (tons) | Unit Price | Total Amount |
|---|---|---|---|
| Foamed Asphalt Grade Oil | 1,014.44 | $700.00 | $710,108.00 |
| Cement Type II/V | 605.35 | $400.00 | $242,140.00 |
| Foamed Asphalt and Cement Treated Aggregate Base | 61,428.36 | $10.54 | $647,454.91 |
| | | **Total** | $1,599,702.91 |

(Doc. 24-2 at 184). Following receipt of the two invoices, SBBI paid Plaintiff a total of $1,357,562.92, (Doc. 34 at 2), which represented payment for both the FAGO and foamed asphalt and cement treated aggregate base.[4] (DCSOF at ¶¶ 17–19; PSOF at ¶¶ 17–19). SBBI rejected "any charges for cement at $400 per ton" because FHA "had not yet approved the change order[,] and it was therefore impossible to invoice the cement component." (DSOF at ¶ 17; Doc. 24-2 at 183). SBBI finally received FHA's approval of the change order in December 2014. (DSOF at ¶ 31; PODSOF at ¶ 31).

In January 2015, SBBI reconciled Plaintiff's two invoices and FHA's Amendment of Solicitation/Modification of Contract. (DSOF at ¶ 32; PODSOF at ¶ 32). Specifically:

> 1) SBBI replaced FHA's estimates under the contract with FHA's "new specifications," or estimates, for material quantities under the change order.[5] (DSOF at ¶ 33). Specifically, FHA estimated the Project would require:

---

[4] Following this payment, Plaintiff had received all money it demanded under the subcontract except for $242,139.99, which is $0.01 less than the $242,140.00 Plaintiff invoiced for the cement.

[5] The Court notes that these estimates first appeared in a letter from FHA to SBBI dated July 10, 2014. (*See* Doc. 24-4 at 139–40). SBBI does not state that these estimates were ever provided to Plaintiff until after Plaintiff completed all work pursuant to the subcontract. (*See also* Doc. 24-1 at 38–39).

- 4 -

(a) 66,800 tons of foamed asphalt and cement treated aggregate base; (b) 1,230 tons of FAGO; and (c) 835 tons of cement type II/V. (Doc. 24-4 at 139–40; DSOF at ¶ 33).

2) SBBI then used unit prices of $10.54 for the foamed asphalt and cement treated aggregate base and $400 for the cement type II/V to calculate a $473.98 FAGO unit price. In other words, setting the FAGO unit price at $473.98 ensured that the total contract price using the FHA estimates for the change order materials would be nearly identical to the original subcontract's total price ($1,621,067.40 for the changed specifications and $1,621,072.00 for the original specifications—a $4.60 difference). (DSOF at ¶¶ 33–36). These calculations are depicted below:

| Item Description | FHA Est. Quantity (tons) | Unit Price | Total Amount |
|---|---|---|---|
| Foamed Asphalt Grade Oil | 1,230.00 | $473.98 | $582,995.40 |
| Cement Type II/V | 835.00 | $400.00 | $334,000.00 |
| Foamed Asphalt and Cement Treated Aggregate Base | 66,800.00 | $10.54 | $704,072.00 |
| | | **Total** | $1,621,067.40 |

3) Finally, SBBI replaced FHA's estimated quantities with the quantities Plaintiff actually supplied. (*Id.* at ¶ 35). Thus, SBBI calculated that it owed Plaintiff $1,370,419.18. (Doc. 34 at 2).[6] These calculations are reflected below:

| Item Description | Actual Quantity (tons) | Unit Price | Total Amount |
|---|---|---|---|
| Foamed Asphalt Grade Oil | 1,014.44 | $473.98 | $480,824.27 |
| Cement Type II/V | 605.35 | $400.00 | $242,140.00 |
| Foamed Asphalt and Cement Treated Aggregate Base | 61,428.36 | $10.54 | $647,454.91 |
| | | **Total** | $1,370,419.18 |

---

[6] The Court notes that SBBI explains a slightly different method it used to calculate the amount owed to Plaintiff. (*See* DSOF at ¶ 35). The method described by the Court obtains the same result in fewer steps.

Additionally, in an earlier Order, the Court highlighted multiple mathematical errors in SBBI's calculations. (*See* Doc. 33). Correcting these errors resulted in SBBI admitting it owed Plaintiff an additional $12,856.26 under the subcontract, for a total of $1,370,419.18. (Doc. 34 at 2). SBBI has paid this amount to Plaintiff. (*Id.*).

- 5 -

SBBI believes that the term "no-cost change order" implied the performance of these reconciliation calculations. (DSOF at ¶ 19). Thus, after completing the reconciliation, SBBI determined that it had paid Plaintiff in full. (*Id.* at ¶ 38).

On the other hand, Plaintiff believes that the term "no-cost change order" meant that the total price of the original contract ($1,621,072.00) would be greater than or equal to the total price of the subcontract reflecting the changed specifications and actual quantities ($1,599,702.91). (Doc. 23 at 3). Plaintiff states this is a "no-cost change order" because "the changed product would require [Plaintiff] to use less oil so the tonnage quantity was going to be reduced and the difference was going to pay for the cement component." (*Id.*).

Plaintiff filed this suit against SBBI and SBBI's surety, Hartford Fire Insurance Company, under the Miller Act, which requires contractors doing construction contract work for the United States government to obtain performance and payment bonds to ensure the work is completed and that all persons supplying labor and material for the project are paid. *See* 40 U.S.C. §§ 3131–34 (2012). Plaintiff also sued Defendants under breach of contract and promissory estoppel theories. (*See* Doc. 1).

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support that assertion by "citing to particular parts of materials in the record," including depositions, affidavits, interrogatory answers or other materials, or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id.*

**III.  ANALYSIS**

Plaintiff seeks entry of partial summary judgment in favor of its breach of contract and Miller Act claims. (Doc. 23). Defendants seek entry of summary judgment against Plaintiff's breach of contract, Miller Act, and promissory estoppel claims. (Doc. 25).

**A.  Breach of Contract and Miller Act Claims**

The parties dispute the meaning of a "no-cost change order," which was the term used by both parties to describe their contract modification. Plaintiff asks that the Court

grant summary judgment on its breach of contract and Miller Act claims and award Plaintiff $229,283.73[7], plus interest costs and attorneys' fees. (Docs. 23 at 12; 34 at 2). Plaintiff argues that the parties never agreed to a uniform definition of "no-cost change order," but the parties' oral modification of the contract did not change a pre-established "agreement that the price of the [FAGO] would be $700.00 per ton." (Doc. 32 at 6, 9–10). In contrast, Defendants ask the Court to grant summary judgment in their favor on Plaintiff's breach of contract and Miller Act claims. (Doc. 25 at 5). Defendants argue that Plaintiff agreed to the reduction in the unit price of FAGO by agreeing to SBBI's unambiguous definition of a "no-cost change order." (*See* Docs. 25 at 5, 7–8, 10; 31 at 6–7). Thus, Defendants argue, the parties formed a valid contract setting a $473.98 FAGO unit price, and SBBI fulfilled its obligations under the contract by fully paying Plaintiff. (Doc. 31 at 6–7).

The Miller Act, 40 U.S.C. §§ 3131–34, governs surety bonds on federal construction projects that cost more than $100,000. Under the Miller Act, a contractor must post both a performance bond and a payment bond for a project. 40 U.S.C. § 3131. Additionally, under the Miller Act:

> Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.

*Id.* § 3133(b)(2).

To establish a Miller Act claim, Plaintiff must show:

> (1) the materials were supplied in prosecution of the work provided for in the contract; (2) [Plaintiff] has not been paid; (3) [Plaintiff] had a good faith belief that the materials were intended for the specified work; and (4) the jurisdictional requisites were met.

---

[7] This number differs from the amount listed in footnote four due to an additional payment of $12,856.26 made by Defendants to Plaintiff during the course of this litigation. (*See* Doc. 34).

- 8 -

*United States ex rel. Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.*, 750 F.2d 759, 761 (9th Cir. 1984). "The purpose of the Act is to protect persons supplying materials and labor for federal projects, and it is to be construed liberally in their favor to effectuate this purpose." *Id.*

"[S]tate law controls the interpretation of Miller Act subcontracts to which the United States is not a party." *United States ex rel. Reed v. Callahan*, 884 F.2d 1180, 1185 (9th Cir. 1989). Even though Plaintiff is a California corporation and SBBI is a Louisiana corporation, because the contract at issue was both executed and to be performed in Arizona, Arizona law is most applicable. *See United States ex rel. Union Bldg. Materials Corp. v. Haas & Haynie Corp.*, 577 F.2d 568, 571 n.1 (9th Cir. 1978) (applying Hawaiian law to a Miller Act claim where "the contract at issue was both executed and to be performed in Hawaii"). Arizona law is also applicable for the state breach of contract claim.[8] *See Swanson v. Image Bank, Inc.*, 77 P.3d 439, 441–42 (Ariz. 2003) (applying the "most significant relationship" test from the Restatement (Second) of Conflict of Laws § 188).

Under Arizona law, the elements of a breach of contract are: "(1) the existence of a contract; (2) breach; and (3) resulting damages." *First Am. Title Ins. Co. v. Johnson Bank*, 372 P.3d 292, 297 (Ariz. 2016) (citing *Graham v. Asbury*, 540 P.2d 656, 657 (Ariz. 1975)). However, "[i]t is well-established that before a binding contract is formed, the parties must mutually [assent] to all material terms." *Hill-Shafer P'ship v. Chilson Family Tr.*, 799 P.2d 810, 814 (Ariz. 1990). "A distinct intent common to both parties must exist without doubt or difference, and until all understand alike there can be no assent." *Id.* (citing *Gifford v. Makaus*, 540 P.2d 704, 708 (Ariz. 1975)).

---

[8] In mixed sales/services contracts between a contractor and subcontractor, Arizona courts apply the Restatement (Second) of Contracts rather than Article 2 of the Uniform Commercial Code, in the absence of contrary authority. *See AROK Constr. Co. v. Indian Constr. Servs.*, 848 P.2d 870, 874–79 (Ariz. Ct. App. 1993) (applying principles from the Restatement (Second) of Contracts to interpret an oral contract made between a contractor and subcontractor); *see also Bank of Am. v. J. & S. Auto Repairs*, 694 P.2d 246, 248 (Ariz. 1985) ("In the absence of contrary authority Arizona courts follow the Restatement of the Law.").

The Arizona Supreme Court follows the Restatement's provisions regarding the effects of a misunderstanding on the formation of a contract:

> (1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and
>
> (a) neither party knows or has reason to know the meaning attached by the other; or
>
> (b) each party knows or each party has reason to know the meaning attached by the other.
>
> (2) The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if
>
> (a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or
>
> (b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

*Id.* at 815 (quoting Restatement (Second) of Contracts § 20 (Am. Law Inst. 1981)). Thus, "[e]ven though the parties manifest mutual assent to the same words of agreement, there may be no contract because of material difference of understanding as to the terms of the exchange." *Id.* (quoting Restatement (Second) of Contracts § 20 cmt. c).

In determining whether the parties mutually assented to the material terms in a contract, courts may examine the language of the agreement, "the conduct of the parties, and the surrounding circumstances." *Muchesko v. Muchesko*, 955 P.2d 21, 24 (Ariz. Ct. App. 1997); *see also Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 132 P.3d 825, 828 (Ariz. 2006). Importantly, such mutual assent "is based on objective evidence, not on the hidden intent of the parties." *Hill-Shafer*, 799 P.2d at 815. Further, a court may only determine that the parties lacked mutual assent if each party's misunderstanding is reasonable. *Id.* at 816; *see also Heywood v. Ziol*, 372 P.2d 200, 203 (Ariz. 1962); *Buckmaster v. Dent*, 707 P.2d 319, 321–22 (Ariz. Ct. App. 1985).

Finally, "absent or uncertain terms are not fatal to the enforceability of an otherwise binding contract." *AROK Constr.*, 848 P.2d at 876. Rather, the terms of an

agreement are sufficiently certain "if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* (citing Restatement (Second) of Contracts § 33(2)).

Here, the parties assigned materially different meanings to the term "no-cost change order." Plaintiff believed that, because the Project would require less of the substituted materials, the decrease in material quantities would pay for the cement and keep the total contract price below the former contract's total price. (Doc. 23 at 3). Thus, Plaintiff believed a "no-cost change" did not affect the $700.00 FAGO unit price. (*Id.*). On the other hand, SBBI believed that a deduction in the FAGO unit price was necessary to pay for the cement. (Doc. 25 at 5). This unspecified lower unit price was dependent on the estimates later provided by FHA. (*Id.* at 4).

In determining whether the parties formed a contract, the Court must first determine whether the contract language is "'reasonably susceptible' to the interpretation asserted by its proponent." *Earnhardt's*, 132 P.3d at 828 (quoting *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993)). If both interpretations are reasonable, the Court then examines whether the parties have presented extrinsic evidence revealing that the opposing party knew of its differing interpretation. *Id.*; *see also* Restatement (Second) of Contracts § 20. If neither party presents extrinsic evidence, the Court may determine that the parties failed to form a contract because of the materially different meanings attached to the language in the contract. Restatement (Second) of Contracts § 20(1).

### 1. Reasonability of Each Party's Interpretation

The Court finds that each party's interpretation of a "no-cost change order" is reasonable. Both meanings are literally "no-cost" changes because they both result in a lower-than-estimated total contract cost for the Project. Additionally, the parties have presented evidence that bolsters the reasonability of both interpretations. For example, Plaintiff presents evidence in which Robert Durham, who negotiated the "no-cost change order" on Plaintiff's behalf, stated that Plaintiff paid $603.00 per ton for the FAGO.

(Doc. 24-1 at 46). Thus, had Plaintiff agreed to receive only $473.98 per ton of FAGO, Plaintiff would have lost money on the FAGO, which supports Plaintiff's position that there was no such agreement. On the other hand, Defendants present evidence in which Ted Walker, who negotiated the "no-cost change order" on SBBI's behalf, described the difficulty in predicting quantities used for FHA projects. (Doc. 30-1 at 23). Thus, in Mr. Walker's experience, agreeing to a contract "predicated on a theoretical amount of tonnage" would be unpredictable. (*Id.* at 42). Thus, each party's interpretation has "a logic to it." *Farnam Cos. v. Stabar Enters.*, No. CV 03-503-PHX-NVW, 2005 WL 3369473, at *6–8 (D. Ariz. Dec. 12, 2005) (evaluating the reasonableness of two parties' divergent interpretations of a contractual term).

Further, neither party has presented any evidence that the other party's interpretation was unreasonable given the information available at the time of the attempted formation of the new contract. While the original contract defines a "change order," it fails to mention the term "no-cost change order." (*See* Doc. 1-1 at 4). In describing the process for change orders, the contract appears to contemplate only disagreements over price adjustments *before* agreeing to a change order. (*Id.* ("If the parties are unable to agree upon [price] adjustments, [SBBI] may elect to issue the Change Order to [Plaintiff] unilaterally, and any adjustments to [p]rice or time shall be subject to an ultimate determination in accordance herewith.")). Additionally, neither party has presented any extrinsic evidence—e.g., common trade usage known by both parties at the time they agreed to the change order—that would make the other party's interpretation of a "no-cost change order" unreasonable. The parties reasonably could have understood that a "no-cost change order" meant to convey Plaintiff's quantity-based understanding or SBBI's estimate-based understanding.

### 2. Whether Each Party Knew of the Other Party's Interpretation

Given that each party's interpretation was reasonable, the Court turns next to whether either party knew or had reason to know the other party's interpretation of a "no-cost change order." *See* Restatement (Second) of Contracts § 20(2)(a)–(b). Defendants

argue that a "no-cost change order" is an unambiguous term, and both parties shared the interpretation currently held by Defendants at the time they agreed to the change. (Doc. 29 at 10). In support of their contention, Defendants cite to the deposition of Sharon Groesbeck, one of Plaintiff's former officers. (*Id.*). Defendants cite specifically to the following language:

> Q. (By Mr. Thompson) Here's my question. The proposal that you submitted would have had a price for the three units, three different specification units; in other words, so the foamed asphalt, right, it would have had the aggregate base, the cement and the foamed asphalt; right?
>
> A. Correct.
>
> Q. And you would have proposed quantities for each of those particular specified units; correct?
>
> A. Correct.
>
> Q. And then you would have proposed a price for each of those specified units; correct?
>
> A. Correct.
>
> Q. And then that would have added up to the $1,637,282.72; correct?
>
> A. I don't know if to the penny, but yes.
>
> Q. I can tell you that in this case it was within – it was less than $5 in the difference, okay?
>
> A. Close.

(Doc. 30-3 at 18). However, this excerpt is not inconsistent with Plaintiff's interpretation of a "no-cost change order." Plaintiff's assumption all along was that the quantities of materials would decrease to pay for the change in materials. The above definition is actually consistent with either party's interpretations of a "no-cost change order."[9] Thus,

---

[9] Defendants also cite to Mr. Durham's deposition for support as well. (*See* Doc. 31 at 6–7). However, Mr. Durham provides the same interpretation Plaintiff advances in its Motion. (*See* Doc. 24-1 at 18 ("[W]hat was going to happen, because we were using less oil, is that tonnage quantity that was estimated for the 66,000 tons and 1,310 tons was going to drop about 300 tons, which the difference was going to pay for the cement component . . . .")). This does not prove that Mr. Durham knew or had reason to know of SBBI's differing interpretation of a "no-cost change order" upon agreeing to the contract modification.

- 13 -

1   Defendants have failed to present any evidence based on the summary judgment record
2   that Plaintiff knew or had reason to know SBBI's interpretation of a "no-cost change
3   order." However, Plaintiff has not disproven Defendants' theory regarding interpretation;
4   therefore, there remains a question for the jury as to whether Defendants' interpretation
5   of a "no-cost change order" should be operative in interpreting the contract.[10]

6   Plaintiff argues that SBBI's course of performance demonstrates SBBI knew and agreed with Plaintiff's interpretation of a "no-cost change order" at the time the parties modified the contract. Plaintiff cites to three different pieces of evidence to support its argument: (1) an e-mail from SBBI asking Plaintiff to send in two invoices: one invoice that included the FAGO at $700.00 per ton, and a second invoice for the cement at $400.00 per ton, (Doc. 24-2 at 180); (2) SBBI's failure to object after receiving Plaintiff's multiple invoices with $700.00 and $400.00 unit prices for the FAGO and cement, respectively, (Docs. 32 at 7; 24-2 at 186–87); and (3) SBBI's explicit payment for the FAGO at a $700 unit price, and SBBI's reassurance that it would "pay the cement cost" as soon as FHA approved the change order, (Doc. 32 at 10). Plaintiff's theory is that SBBI would not have acted so consistently with Plaintiff's interpretation of a "no-cost change order" if SBBI's interpretation truly differed.

Plaintiff has presented evidence raising a genuine issue of material fact, which must be resolved by a jury. A reasonable jury could infer that SBBI intended to agree with Plaintiff's interpretation of a "no-cost change order" and later altered its intent. *See Tabler v. Indus. Comm'n of Ariz.*, 47 P.3d 1156, 1159 (Ariz. Ct. App. 2002) ("The determination of intent is a factual question."). Because the Court cannot determine SBBI's contemporaneous intent upon entering the contract as a matter of law, it is a question for the jury as to whether (1) the contract is void for failure of the parties to mutually assent to a material term, or (2) the contract is operative on Plaintiff's interpretation of a "no-cost change order." *See* Restatement (Second) of Contracts § 20.

Thus, because there are issues of material fact remaining, the Court must deny

---

[10] Defendants have requested a jury trial. (*See* Doc. 8 at 1).

1   both Plaintiff's Motion and Defendants' Motion as to the breach of contract and Miller
2   Act claims.

### B.     Promissory Estoppel

Defendants also move for summary judgment on Plaintiff's promissory estoppel claim. "The elements of promissory estoppel are a promise, which the promissor should reasonably foresee would cause the promisee to rely upon which the promisee actually relies to his detriment." *Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 736 P.2d 13, 16 (Ariz. Ct. App. 1987). Promissory estoppel "is a proper claim for relief as an alternative to [a] contract claim." *AROK Constr.*, 848 P.2d at 878.

Defendants again argue that its interpretation of a "no-cost change order" precludes Plaintiff's recovery under promissory estoppel because SBBI has fulfilled its promise to Plaintiff through full payment. (*See* Doc. 25 at 11–12). In making this argument, Defendants misconstrue the evidence in the record. Defendants state that both parties "agree that . . . $299,369.09 worth of original estimated material was not installed by [Plaintiff] . . . . This means that $299,369.09 is subtracted from the original contract amount of $1,637,282.72, entitling [Plaintiff] to a total of $1,337,909.03." (*Id.* at 11). However, under Defendants' own definition, a unit price contract "obligates the general contractor to pay the subcontractor all the items as supplied." (*Id.*). Using Plaintiff's interpretation of a "no-cost change order," SBBI would have promised to pay Plaintiff $700.00 per ton of FAGO. From this, a jury could infer that SBBI promised to pay $700.00 per ton of FAGO regardless of what material Plaintiff failed to install.

Defendants also argue that the Court should grant summary judgment in their favor because an individual from FHA and two individuals from SBBI understood "that [Plaintiff] was to receive $400 per ton for the cement and the reduced amount of $473.98 per ton for the [FAGO]." (Doc. 31 at 8–9). However, as discussed in the previous section, Plaintiff has cited to evidence regarding its interpretation of a "no-cost change order" that raises an issue of material fact that a jury must resolve. Thus, Defendants have failed to meet their burden of establishing no disputed issues of material fact regarding promissory

estoppel that would allow the Court to enter summary judgment. *See Celotex*, 477 U.S. at 336 ("Having chosen to base its motion on the argument that there was no evidence in the record to support [the] plaintiff's claim, [the defendant] was not free to ignore supporting evidence that the record clearly contained.").

## IV.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Plaintiff's Motion, (Doc. 23), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion, (Doc. 25), is **DENIED**.

**IT IS FURTHER ORDERED** the parties shall each file a proposed elements/substantive jury instruction for this case within ten (10) days from the date this Order is filed.

Dated this 3rd day of March, 2017.

James A. Teilborg
Senior United States District Judge